IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

LOUIS M. TUTT, III                          )
                                            )
            Plaintiff,                      )
                                            )
      v.                                    )      Case No. 1:19-cv-00588 (PTG/IDD)
                                            )
RYAN D. MCCARTHY,                           )
                                            )
            Defendant.                      )
                                            )

## MEMORANDUM OPINION & ORDER

This matter was before the Court on Defendant's Motion for Summary Judgment (Dkt. 60). Pursuant to Federal Rule of Civil Procedure 56, Defendant moved for summary judgment of Plaintiff's retaliation claim under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e–3. Plaintiff, a civilian Army employee, contended that he engaged in protected activity by assisting a colleague with her Equal Employment Opportunity ("EEO") complaint, and that Defendant retaliated against him by issuing a Management Directed Reassignment ("MDR") that made permanent a temporary detail from the Audit Readiness Directorate (hereinafter, "Audit Readiness") to the Human Capital Directorate (hereinafter, "Human Capital"). Defendant contended that it issued the MDR, not as retaliation for Plaintiff's protected activity, but due to multiple allegations of harassment against Plaintiff during his time in Audit Readiness, an investigation that found those allegations credible, and Plaintiff's successful temporary detail with Human Capital.

On January 17, 2023, Defendant moved for summary judgment. Dkt. 60. On February 23, 2023, the Court heard oral argument. Dkt. 75. For the reasons stated from the bench as well as those that follow, the Court found that Plaintiff failed to: (1) establish a *prima facie* case of

retaliation; and (2) present evidence from which a jury could reasonably conclude that Defendant's proffered reasons for issuing the MDR were not legitimate but were pretext for retaliation. Accordingly, the Court GRANTED Defendant's Motion in its entirety.[1]

## BACKGROUND[2]

In August 2015, Plaintiff Louis Tutt began working in the Office of the Assistant Secretary of the Army for Acquisition, Logistics, and Technology ("ASA/ALT") as a Program Analysis Officer for the Director of Audit Readiness as a civilian employee. *See* Dkt. 61-1 ("DEX 1") at 6–7; Dkt. 61-12. In November 2015, Plaintiff assumed the role of Acting Director of Audit Readiness.[3] DEX 1 at 9; Dkt. 61-15 ("DEX 15"). While Plaintiff served as Acting Director of Audit Readiness, his first-line supervisor and performance rater was Colonel ("COL") Vincent Malone, the Military Deputy to the Deputy Assistant Secretary of the Army for Plans, Programs, and Resources ("DASA-PPR"), and his second-line supervisor was John Daniels, the DASA-PPR. DEX 1 at 12–13; Dkt. 61-2 ("DEX 2") at 10; DEX 15.

### A.   Plaintiff's Alleged Protected Activity

In or around late September or early October 2016, Plaintiff spoke on the phone with the attorney of his colleague, Dr. Annette Jones, about an ongoing complaint Dr. Jones had submitted to the EEO (hereinafter, "Jones Complaint"). Dkt. 66-7 at 7. Plaintiff contended he provided Dr.

---

[1] After ruling on the Motion in open court, the Court indicated that it would issue a written opinion to further explain its ruling. Dkt. 76.

[2] The facts below are largely undisputed. Plaintiff "disputed" a number of facts in his Opposition—largely regarding timing and procedural details related to the ways in which his temporary detail, internal investigation, letter of warning, and MDR were effectuated, *see* Dkt. 69 ¶¶ 1–42—but such disputes are immaterial or irrelevant to the disposition of the issues in this case.

[3] Defendant alleged Plaintiff was "Acting Director" and Plaintiff alleged he was "Director" of Audit Readiness; however, Plaintiff testified that this role change did not affect his pay or grade. *See* Dkt. 69 ¶ 2; DEX 1 at 9. This dispute is irrelevant to the disposition of Plaintiff's retaliation claim.

Jones' attorney with information about a recent incident wherein Daniels, who was also Dr. Jones' supervisor, "accused her of not doing her job during a meeting." *Id.* In January 2017, Plaintiff was present while Dr. Jones spoke with her attorney over the phone about an incident wherein Plaintiff transported Dr. Jones to receive medical treatment, which was connected to the claims in the Jones Complaint. *Id.*

**B.     Allegations of Harassment Against Plaintiff**

During the fall of 2016, Audit Readiness worked with a team of contractors from Ernst and Young ("E&Y") led by E&Y Partner Joseph Quinn. Dkt. 61-5 ("DEX 5") at 1. In September 2016, Quinn complained to COL Malone that Plaintiff had been "intimidating" E&Y employees. Dkt. 61-4 ("DEX 4") at 17; DEX 5 at 1.

On October 19, 2016, Quinn sent an email to COL Malone (among others) explaining that the E&Y team had tried to comply with Plaintiff's requests concerning personnel and deliverables, but that, in Quinn's opinion, "this ha[d] become a situation of harassment." Dkt. 62-3 at 3–5. Quinn continued: "I cannot in good conscience allow my team to work in the same office with [Plaintiff] until we have an understanding of his direction to the team, our deliverables, our contractual requirements, and most importantly his ability to respect our people." *Id.* at 4. Quinn informed COL Malone that the E&Y team would no longer be working from the ASA/ALT office. *Id.*

On October 20, 2016, COL Malone forwarded Quinn's email to Plaintiff, informed Plaintiff that the E&Y team would "not be working in [Plaintiff's] area until further notice," and directed Plaintiff: "Do not correspond further w/ EY effective immediately and until further notice. More guidance to follow." *Id.* at 3. That day, Plaintiff responded that this was "a serious issue" and that he had "to take immediate action" and would "hold EY, specifically Joe Quinn

3

liable for his accusation of harassment." *Id.* at 2. COL Malone responded shortly thereafter, reiterating his order "not to correspond w/ EY given the allegations against [Plaintiff]," and that COL Malone intended "to contain the issue." *Id.* COL Malone explained to Plaintiff that "there [wa]s a process to resolve the issue and it d[id] not involve [Plaintiff] talking to EY directly[,]" which "could further exasperate [sic] the problem." *Id.* COL Malone stated that the DASA-PPR was "taking the initial steps in the process to formally look into these allegations and resolve the issue." *Id.* That evening, COL Malone informed Plaintiff that an investigation pursuant to Army Regulation 15-6 (hereinafter, "AR 15-6") "was the correct path to take" to evaluate the allegations against Plaintiff. DEX 4 at 21. The next day, on a conference call with COL Malone, the E&Y team, and Army contracting personnel, the E&Y team agreed to return their personnel to the ASA/ALT office on the condition that they would no longer be working with Plaintiff. DEX 5 at 3; Dkt. 63-4 at 3–4.

On November 8, 2016, Scott Smith, an E&Y supervisor working with Audit Readiness forwarded an email from E&Y employee, Jin Pyo, to COL Malone, Quinn, and Marlin Erickson, the Army contracting officer's representative. Dkt. 64-1 at 3–4. Pyo's email explained that Plaintiff, through ASA/ALT's new E&Y point of contact, had set a meeting with Pyo and her colleague that day to discuss their work moving forward. *Id.* Smith requested help navigating the situation, noting that Plaintiff "continue[d] to insert himself" even though he was no longer E&Y's point of contact, which made for a "challenging environment." *Id.* at 3. Smith asked for discretion "in sharing details of this email directly with [Plaintiff]" as Smith did not want to put his team "in an uncomfortable situation where [Plaintiff] is directly confronting them regarding this." *Id.* at 2. In response, Erickson and COL Malone arranged to relocate the E&Y team from the ASA/ALT office. *Id.* COL Malone testified that the November 8 incident demonstrated a "clear violation"

of his previous order to Plaintiff not to communicate with the E&Y team.[4] DEX 4 at 39.

## C.   Plaintiff's Detail to the Human Capital Directorate

Given the November 8, 2016 incident, COL Malone and Daniels agreed to temporarily detail Plaintiff out of Audit Readiness until the conclusion of the AR 15-6. DEX 4 at 40; DEX 5 at 4. On November 21, 2016, Plaintiff was detailed to Human Capital. *See* Dkt. 66-6. Plaintiff experienced no change to his pay or grade during the detail.[5] *Id.*; DEX 1 at 43. During Plaintiff's detail, Karen Walker, Director of Human Capital, was his first-line supervisor and performance rater; COL Malone was his second-line supervisor; and Daniels was his third-line supervisor. Dkt. 61-6 ("DEX 6") at 10, 14. Plaintiff's detail was executed as a "job swap" wherein Plaintiff went from Audit Readiness to Human Capital while another employee went from Human Capital to Audit Readiness. *Id.* at 20. Plaintiff's detail was extended several times beyond the initial 120-day period. *See id.* at 29; Dkts. 64-3 to 64-6. In September 2017 and April 2018, Plaintiff received positive ratings from Walker during his detail in Human Capital. See Dkt 66-1 ("DEX 40"); Dkt. 66-9 ("DEX 48").

## D.   Plaintiff's AR 15-6 and Letter of Warning

### *1.    AR 15-6*

In or around October or November 2016, COL Malone and Daniels agreed that an AR 15-

---

[4] Separate from the foregoing harassment allegations, COL Malone also testified that he had observed an "escalating conflict" between Plaintiff and Lieutenant Colonel ("LTC") Kovacs, another employee in Audit Readiness, during the fall of 2016, which resulted in COL Malone physically separating Plaintiff's and LTC Kovacs' workspaces. DEX 5 at 1; Dkt. 62-2. Plaintiff acknowledged that he confronted LTC Kovacs after he observed LTC Kovacs using derogatory language when referring to Black women employees. Dkt. 69 at 23.

[5] While Plaintiff disputed that his "pay grade and his grade did not change based on this detail," this dispute appears to revolve around Plaintiff's alleged title of Director of Audit Readiness. Dkt. 69 ¶ 16; *see supra* note 3. Plaintiff testified that neither his pay nor grade changed upon his temporary detail. *See* DEX 1 at 43.

6 was the appropriate course of action to investigate the harassment allegations against Plaintiff. DEX 2 at 22; Dkt. 61-3 ("DEX 3") at 2; DEX 4 at 24–25; DEX 5 at 3. On June 13, 2017, Daniels formally appointed COL Johnnie Edmonds as the Inquiry Officer for Plaintiff's AR 15-6. Dkt. 64-7. At the time, COL Edmonds was not assigned to the DASA-PPR and did not report to Daniels, COL Malone, or Walker. Dkt. 61-11.

On October 31, 2017, COL Edmonds submitted his Final Report for the AR 15-6. *See* Dkt. 62-1 ("DEX 19").[6] In the AR 15-6 Final Report, COL Edmonds concluded that "[i]t is clear from the preponderance of evidence . . . that [Plaintiff] was ill-equipped and unqualified for the technical and leadership demands required of his position." *Id.* at 2. COL Edmonds continued that the documents and interviews "strongly indicate[] and impl[y] that under the direction of [Plaintiff], the [Audit Readiness] workplace environment often transitioned into a hostile, intimidating and in some cases retaliatory workplace environment for select staff and contractors." *Id.* COL Edmonds noted that, despite multiple requests during the AR 15-6, Plaintiff had refused to provide written responses to his questions, and that Plaintiff's interview was "confusing" and "difficult/impossible to reconcile with statements from the majority of other interviews related to [the] inquiry."[7] DEX 19 at 8; *see also id.* at 53–58. COL Edmonds answered "yes" to the following questions in the AR 15-6 Final Report:

---

[6] Plaintiff disputed the "authenticity" of this document and pointed to another document, dated August 11, 2017, also with the subject line "Inquiry-DASA-PPR Final Report." *See* Dkt. 69 ¶¶ 23–24; Dkt. 70-1. Defendant explained that the earlier-dated version was submitted for legal review on August 11, 2017 and that any differences between the two versions of the Final Report were "immaterial." Dkt. 72 at 7. Defendant's assertion is corroborated by the documents, *see* DEX 19 at 6, and the Court does not find authenticity issues with either the August 2017 version or the October 2017 version of the Final Report.

[7] Plaintiff contended that he sought to review COL Edmonds' "appointment orders" and to have all testimony in the AR 15-6 "accompanied by a sworn statements [sic] by each testifying individual as to its accuracy." Dkt. 69 ¶ 22. Plaintiff maintained that he was "at all times, willing to speak to the [AR] 15-6 investigator to provide a sworn statement." *Id.*

- Has [Plaintiff] failed to treat employees and government contractors with dignity and respect?
- Has [Plaintiff] harassed government contractors, particularly employees of [E&Y], in regard to their contract performance?
- Has [Plaintiff] improperly changed contractual requirements and/or deliverables?
- Has [Plaintiff] failed to provide adequate guidance and direction to employees and government contractors in regard to mission requirements?
- Has [Plaintiff] behaved in an unprofessional manner in regard to his interactions with employees or government contractors?
- Did [Plaintiff] violate [COL Malone]'s directive issued on or about 9 November 2016, not to communicate with [E&Y] support contractors?

*Id.* at 4–5. COL Edmonds further noted that Plaintiff: "on numerous occasions demonstrated the ability and willingness to harass both government and contractor personnel assigned to the Army Audit Readiness effort"; did "not fully understand the fundamental workings of a contractual business relationship"; provided guidance that "was often ineffective and appeared based on a fundamental lack of understanding of the terms and conditions of this respective contractual effort"; took actions that did "not fully comply with the Army value of Respect"; and maintained a "leadership style during this period [that] closely aligns with the definition of a Toxic Leader[.]" *Id.* COL Edmonds recommended that the Office of the Judge Advocate General, Labor and Employment Law Division, be consulted for potential remedies. *Id.* at 2.

On February 13, 2018, after Army legal counsel had finished its review of the AR 15-6 Final Report, Daniels signed a memorandum indicating that he reviewed and approved of the findings and recommendation in the Final Report. DEX 2 at 63; DEX 3 at 3; DEX 19 at 9.

### 2. *Letter of Warning*

In or around January 2018, Daniels forwarded the AR 15-6 Final Report to Walker. DEX 6 at 30–31. Walker testified that she worked with Labor and Management Employee Relations ("LMER") personnel to determine appropriate disciplinary actions for Plaintiff. *See id.* at 31–33.

7

Walker, with assistance from LMER personnel, ultimately drafted a letter of warning, which is considered an informal disciplinary action. *See id.* at 32–33; Dkt. 65-2; Dkt. 61-8 at 25. On May 16, 2018, Walker issued Plaintiff the letter of warning. Dkt. 65-3 ("DEX 39"); DEX 6 at 32–33; Dkt. 61-7 ("DEX 7") at 3. The letter indicated its purpose was to "warn" Plaintiff of his "misconduct while performing Audit Readiness Director Duties" and advised Plaintiff that "future misconduct" could result in "further disciplinary action." DEX 39 at 2. Walker testified that the letter had "no impact on [Plaintiff's] pay, grade, benefits, or job responsibilities, was not placed into his official personnel file, and did not affect his eligibility for future employment opportunities." DEX 7 at 3; *see also* DEX 1 at 46 (Plaintiff testifying that the letter of warning did not affect his pay, grade, or benefits). On May 17, 2018, Plaintiff acknowledged receipt of the letter. DEX 39 at 3.

### E.     The Management Directed Reassignment ("MDR")

On May 30, 2018, Daniels issued a notice of MDR to Plaintiff to "formally align" Plaintiff with the Human Capital position to which he had been detailed. Dkt 66-2 ("DEX 41"). The notice informed Plaintiff that the "new role [wa]s being directed based on the needs of the organization, but more importantly, [Plaintiff's] demonstrated abilities" in performing the duties of the position, and that Plaintiff had a right to reply to the MDR and to indicate his acceptance or declination of the proposed reassignment. *Id.* at 2. The MDR notice informed Plaintiff that if he "decline[d] this reassignment, [he] may be subject to removal from the Federal Service for failing to accept a directed reassignment." *Id.* at 3.

On June 6, 2018, Plaintiff declined the reassignment. *See* Dkt. 66-3. Plaintiff attached a memorandum to his declination stating that: Daniels had "fostered a hostile work environment" and had "shown prejudice to [Plaintiff] and other employees in this directorate"; Plaintiff

8

considered his detail to Human Capital and the results of the AR 15-6 an "indictment . . . without merit"; the change in Plaintiff's duties and position was "an attempt to degrade [Plaintiff's] performance and show cause to remove [Plaintiff] from the government"; and Daniels' actions were "consistent with . . . retribution and reprisal." *Id.* at 3. The memorandum also indicated Plaintiff's belief that Walker had issued him the letter of warning on Daniels' behalf. *Id.*

On July 26, 2018, Plaintiff notified Daniels via email that he was accepting the MDR "under protest." Dkt. 66-4 at 2. Plaintiff stated that he believed the MDR was "motivated by illegal retaliation for [Plaintiff's] involvement in and support of a Title VII discrimination investigation into Dr. Annette Jones's claims of discrimination and for having reported certain [E&Y] employees for contractor fraud against the government." *Id.* Plaintiff also notified Daniels that he was filing an EEO complaint. *Id.*

The MDR took effect on September 30, 2018. *See* Dkt. 66-5. Plaintiff's pay plan, grade, and total salary remained the same.[8] *See id.*

### F.  EEOC and Legal Proceedings

Plaintiff alleged he contacted an EEO official on July 13, 2018 and filed a formal EEO complaint against Defendant on or around August 15, 2018.[9] Dkt. 18 ¶¶ 46, 51.

The operative complaint, filed on October 21, 2019, alleged one count of discrimination on the basis of race and one count of retaliation under Title VII. *See* Dkt. 18. District Judge Liam O'Grady granted Defendant's motion to dismiss, which was affirmed in part and vacated in part by the Fourth Circuit. *See* Dkts. 19, 24, 29. Via an unpublished opinion, the Fourth Circuit found,

---

[8] Plaintiff disputed that the MDR did not "result[] in any change to his pay grade, salary, or benefits." Dkt. 69 ¶ 37. This contention is inconsistent with the evidence, *see* Dkt. 66-5, and Plaintiff does not point to any evidence in the record that supports such a contention.

[9] Plaintiff alleged, and Defendant conceded, that his complaint had been pending before the Equal Opportunity Commission ("EEOC") for more than 180 days. *Id.* ¶ 4; Dkt. 47 ¶ 4.

regarding Plaintiff's retaliation claim, that Plaintiff had pleaded facts "including his supervisors' repeated comments regarding [Plaintiff's] protected activity and events occurring prior to the adverse action, that . . . are sufficient to plausibly bridge the gap between [Plaintiff's] protected activity and his permanent reassignment." Dkt. 29 at 5.

On remand, this case was reassigned to the undersigned. On January 17, 2023, Defendant filed the instant Motion for Summary Judgment on Count Two of Plaintiff's Amended Complaint. Dkt. 60.

## I.   **LEGAL STANDARD**

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Norfolk S. Ry. Co. v. City of Alexandria*, 608 F.3d 150, 156 (4th Cir. 2010) (quoting Fed. R. Civ. P. 56). A genuine dispute about a material fact exists if "after reviewing the record as a whole, a court finds that a reasonable jury could return a verdict for the nonmoving party." *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012). All inferences must be made in favor of the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam). A party survives summary judgment by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials[.]" Fed. R. Civ. P. 56(c)(1)(A).

## II.   **DISCUSSION**

Under Title VII, an employer is prohibited from retaliating against an employee "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under the statute. 42 U.S.C. § 2000e–3(a). A plaintiff may prove

retaliation through direct or indirect evidence of retaliatory animus, or through the burden-shifting framework set forth by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*. 411 U.S. 792 (1973); *see Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015). "Direct evidence encompasses 'conduct or statements' that both (1) 'reflect directly the alleged discriminatory attitude,' and (2) 'bear directly on the contested employment decision.'" *Laing v. Fed. Express Corp.*, 703 F.3d 713, 717 (4th Cir. 2013) (quoting *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006)). Under the *McDonnell Douglas* framework, a plaintiff must first establish a *prima facie* case by showing that (1) he "engaged in protected activity"; (2) that his employer took a materially adverse action against him; and (3) "that 'a causal relationship existed between the protected activity and the adverse employment activity.'"[10] *Roberts v. Glenn Indus. Grp.*, 998 F.3d 111, 122 (4th Cir. 2021) (quoting *Foster*, 787 F.3d at 250). If the plaintiff establishes a *prima facie* case, "the burden shifts to the employer to show that it took the adverse action for a legitimate non-retaliatory reason. If the employer makes this showing, the burden shifts back to the plaintiff to rebut the employer's evidence by demonstrating the employer's purported non-retaliatory reasons were pretext for discrimination." *Id.* (internal citation omitted).

Plaintiff relied on the application of the *McDonnell Douglas* framework to prove his claim. Defendant did not contest that Plaintiff engaged in protected activity by assisting Dr. Jones with her EEO complaint or that the MDR constituted a materially adverse action within the meaning of Title VII. Dkt. 61 at 22. Thus, the only element of Plaintiff's *prima facie* case Defendant challenged was causation.

---

[10] The proper recitation of the second element for Title VII retaliation claims is a "materially adverse action[,]" rather than "adverse employment action[,]" which is required for discrimination claims. *Hinton v. Va. Union Univ.*, 185 F. Supp. 3d 807, 828 (E.D. Va. 2016).

A.    **Plaintiff Failed to Establish a Causal Connection Between His Protected Activity and the MDR**

There is no evidence that any of Plaintiff's supervisors—COL Malone, Daniels, or Walker—had actual knowledge of Plaintiff's protected activity at the time of the MDR.  Dkt. 61 at 22.  Plaintiff failed to establish that COL Malone and Daniels knew about Plaintiff's protected activity at the time of the MDR.  And even if the Court accepted that there was sufficient evidence that Walker knew about Plaintiff's protected activity at the time of the MDR, Plaintiff still failed to establish a causal connection between his protected activity and the MDR due to (1) the lack of evidence of recurring retaliatory animus and (2) the lack of temporal proximity between the two events.

"To satisfy the third element [of a *prima facie* case of retaliation], the employer must have taken the [materially adverse] action *because* the plaintiff engaged in a protected activity."  *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998).  A plaintiff may establish causation by showing "temporal proximity" between the two incidents, or by "establish[ing] the existence of other facts that alone, or in addition to temporal proximity, suggest[] that the adverse employment action occurred because of the protected activity."  *Johnson v. United Parcel Serv., Inc.*, 839 F. App'x 781, 784 (4th Cir. 2021).  "Specifically, evidence of recurring retaliatory animus during the intervening period [between the protected activity and the adverse action] can be sufficient to satisfy the element of causation."  *Lettieri v. Equant Inc.*, 478 F.3d 640, 650 (4th Cir. 2007).  The Fourth Circuit has also held that "the employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish" causation because "by definition, an employer cannot take action because of a factor of which it is unaware[.]"  *Dowe*, 145 F.3d at 657; *see also Roberts*, 998 F.3d at 124 ("To establish a causal relationship between the protected activity and the [adverse action], a plaintiff must show that the

12

decisionmaker was aware of the protected activity at the time the alleged retaliation occurred.").

Defendant offered extensive evidence that COL Malone, Daniels, and Walker did not know at the time of the MDR that Plaintiff was involved with the Jones Complaint. *See* DEX 2 at 14–15 (Daniels testifying that Dr. Jones did not mention Plaintiff in discussions about her complaint); DEX 3 at 3 (Daniels testifying that he was "not aware" of Plaintiff's involvement with the Jones Complaint before July 26, 2018); DEX 4 at 15 (COL Malone testifying that he was "not aware" at any point that Plaintiff was assisting with the Jones Complaint); DEX 5 at 4 (COL Malone testifying that he learned of Plaintiff's protected activity during the course of this litigation); DEX 6 at 12–13, 72 (Walker testifying that she learned about the Jones Complaint and Plaintiff's involvement in that Complaint during her deposition for Plaintiff's EEO complaint in 2018). Plaintiff did not dispute that he "did not inform COL Malone, Daniels, or Walker that he was involved in any respect with [Dr.] Jones' EEO activity before the three supervisors took any of the actions challenged in this case." Dkt. 61 ¶ 39; Dkt. 69 ¶ 39. Plaintiff testified more specifically that he did not tell COL Malone, Daniels, or Walker about his phone conversation with Dr. Jones' attorney. DEX 1 at 23–24. Plaintiff also confirmed that he never discussed the Jones Complaint with COL Malone, and that the "first time" he informed Daniels he had assisted with the Jones Complaint was while accepting the MDR in July 2018. *Id.* at 28, 51–52.

Thus, because Plaintiff did not point to direct evidence that his supervisors knew about his protected activity, he asked this Court to infer that they knew. As to COL Malone and Daniels, Plaintiff contended that the Court should infer knowledge of Plaintiff's protected activity because they knew he was friends with Dr. Jones. Dkt. 69 at 22. Contrary to Plaintiff's assertion, only COL Malone testified that he knew Plaintiff and Dr. Jones were friends. *See* DEX 4 at 15; DEX 2 at 15–16. Regardless, it is unreasonable to infer that because COL Malone knew Plaintiff and Dr.

Jones were friends, he also knew that Plaintiff was assisting Dr. Jones with her EEO complaint.

In a similar vein, Plaintiff contended that the Court should infer that COL Malone, Daniels, and Walker knew about his protected activity based on an inquiry Plaintiff made to James McPherson in the Office of General Counsel ("OGC") in February 2018. Dkt. 69 at 22. On February 2, 2018, Plaintiff emailed McPherson inquiring about the status of the AR 15-6 and positing that he believed the AR 15-6 was "reprisal for assisting an employee with the violation of civil rights and whistleblowing about the execution of a contract." Dkt. 71-15 at 3. McPherson responded that he would "make[] some inquiries and find out the status of the 15-6." *Id.* at 2. But it is unreasonable to infer, without anything more than Plaintiff's speculation, that McPherson (or anyone from OGC) told Plaintiff's supervisors that Plaintiff had engaged in protected activity by assisting another employee in filing a civil rights complaint. *See Roberts*, 998 F.3d at 124 (stating that the analysis correctly "center[s] on what the relevant decisionmaker knew at the time of the [materially adverse action], not on any knowledge other employees may have had that could be imputed to the employer"). Thus, as there is no evidence that COL Malone or Daniels knew about Plaintiff's protected activity at the time of the MDR, Plaintiff's retaliation claim hinges solely on Walker's knowledge.

Plaintiff contended that the Court should infer that Walker knew about Plaintiff's protected activity based on a conversation between the two in or around late 2016 or early 2017.[11] The evidence as to the circumstances around and substance of this conversation is inconsistent, both

---

[11] Plaintiff testified in connection with his EEO complaint that this conversation occurred in December 2016, though in his EEO complaint Plaintiff stated that this conversation occurred in early 2017. Dkt. 63-2 ("DEX 23") at 6; Dkt. 66-8 ("DEX 47") at 8. Plaintiff initially stated in his operative complaint that this conversation occurred in early 2017, but later stated in his interrogatory responses that this conversation occurred in or around October 2016. Dkt. 18 ¶¶ 31–32; Dkt. 72-5 ("DEX 53") at 5. Walker testified that she believed the conversation occurred in late 2016 or early 2017. Dkt. 69-1 ("PEX 1") at 74.

between Plaintiff's own testimony and statements, and between Plaintiff's and Walker's versions of the conversation. Plaintiff's August 2018 EEO complaint stated: "Walker asked [Plaintiff] why he was so supportive of Dr. Jones. During that conversation, [Walker] warned [Plaintiff] that he was, 'going to go down the same path as [Dr. Jones] if he continues to support her.'" DEX 47 at 8. In a November 2018 deposition connected to his EEO complaint, Plaintiff testified that Walker told him that "she was concerned that [Plaintiff] was going down the same path by helping [Dr. Jones]." DEX 23 at 6. Plaintiff testified that he was "not sure what [Walker] meant by that," but clarified that Walker "didn't use the word EEO" in her statement. *Id.* at 6–7. The October 21, 2019 operative complaint alleged that Plaintiff expressed oral support when Dr. Jones made in-person complaints to Daniels, and that "Walker asked [Plaintiff] why he was so supportive of [Dr.] Jones, and why [Plaintiff] helped [Dr.] Jones." Dkt. 18 ¶ 22–23. The operative complaint also alleged that in early 2017, Walker asked Plaintiff "why he was so supportive of [Dr.] Jones" and "warned [Plaintiff] that he was 'going to go down the same path as [Dr. Jones] if he continued to support her.'" *Id.* ¶ 32.

By the time discovery commenced in this case, Plaintiff's recollection of this conversation had shifted. In his October 24, 2022 sworn interrogatory responses, Plaintiff alleged:

> During a conversation with [Plaintiff] outside of Dr. Jones' office, Walker said something to [Plaintiff] to the effect of, "[i]f you get involved with [Dr. Jones'] case then 'we' are going to get you." Walker instructed [Plaintiff] not to "get involved" with "[Dr. Jones] and her complaint." In this same conversation, Walker warned [Plaintiff] against going down the same path as Dr. Jones, which [Plaintiff] perceived as further instruction not to assist her. Walker referred to Dr. Jones as a "failure" that [Plaintiff] should not get involved with and stated her belief that [Plaintiff] was "better than that."

DEX 53 at 5. And in a December 5, 2022 deposition Plaintiff testified that Walker

> [referenced] Dr. Jones's complaint and [said] you should not get involved. And she told me that -- she said a lot of things, and she was threatening. When she said, "We" -- she didn't say names. But she said, "We will get you." She said a few other things and I -- the last thing I remember saying was, "I don't like being

15

threatened." And I left.

DEX 1 at 31.

Conversely, Walker testified in a deposition that she told Plaintiff "don't hitch your wagon" to Dr. Jones. PEX 1 at 73. Walker testified that, around that time, she had observed Plaintiff and Dr. Jones "having many conversations," and that she knew Dr. Jones "was struggling []performance-wise in her job" and "didn't want [Plaintiff] to . . . get connected and get realigned and aligned with [Dr. Jones] to . . . get in the same position from a performance perspective." *Id.* at 73, 75. Walker clarified that she "did not want [Plaintiff] to get caught up in anything performance-wise because he was doing so well[.]" *Id.* at 75. Even if the Court inferred from Plaintiff's most recent accounts of this conversation—which, admittedly, are inconsistent with Plaintiff's allegations in the October 21, 2019 operative complaint and expressly conflict with Plaintiff's allegations related to his EEO complaint—that Walker knew about Plaintiff's protected activity in or around the time of their conversation in late 2016 or early 2017, Plaintiff could not establish causation.

Apart from the single conversation between Plaintiff and Walker discussed above, there is no other "evidence of recurring retaliatory animus during the intervening period" between Plaintiff's protected activity and the MDR that establishes causation as to Walker. *Lettieri*, 478 F.3d at 650. Despite Plaintiff's contentions to the contrary, Plaintiff's initial detail to Human Capital, the AR 15-6, and the letter of warning do not constitute evidence of retaliatory animus.[12]

---

[12] Plaintiff contended for the first time in his Opposition that Defendant's "differential treatment" of Plaintiff and LTC Kovacs was demonstrative of retaliatory animus. Dkt. 69 at 23–25. However, beyond merely asserting that he and LTC Kovacs "were both Senior Level employees supervised by [COL] Malone," Plaintiff failed to "provide any evidence regarding th[is] would-be comparator['s] position[], supervisors, history, or other relevant information" and, accordingly, the Court finds this attempt at using comparator evidence meritless. *Ullrich v. CEXEC, Inc.*, 709 F. App'x 750, 754 (4th Cir. 2017) (finding the plaintiff's "attempt to show pretext through the use of comparators is without merit" because the plaintiff failed to provide relevant information about

"As the Fourth Circuit has stated, the 'anti-discrimination statutes do not insulate an employee from discipline for violating the employer's rules or disrupting the workplace.' Put differently, Title VII 'was not intended to immunize insubordinate, disruptive, or nonproductive behavior at work.'" *Sadeghi v. Inova Health Sys.*, 251 F. Supp. 3d 978, 992 (E.D. Va. 2017), *aff'd*, 711 F. App'x 174 (4th Cir. 2018) (first quoting *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (4th Cir. 1999), then quoting *Armstrong v. Index J. Co.*, 647 F.2d 441, 448 (4th Cir. 1981)). But for Plaintiff's own behavior that caused numerous, consistent complaints from members of the E&Y team, there would have been no cause for Plaintiff's detail out of Audit Readiness; there would have been no allegations of harassment to precipitate the AR 15-6; and there would have been no need for a letter warning Plaintiff of his "misconduct while performing Audit Readiness Director Duties." DEX 39 at 2. None of these events evince an intent to retaliate, and Plaintiff cannot now cast the legitimate consequences of his own behavior as evidence of retaliatory animus.

Finally, the lack of temporal proximity between Plaintiff's protected activity in or around late September or early October 2016 and the May 2018 MDR further supports a finding that there is no causal connection between the two events. As temporal proximity between the protected activity and the adverse action can be sufficient to "satisf[y] the less onerous burden of making a prima facie case of causality[,]" *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir.1989), the Fourth Circuit has stated it "believe[s] the opposite to be equally true[,]" *Dowe*, 145 F.3d at 657. In other words, "[a] lengthy time lapse between the employer becoming aware of the protected activity and the alleged adverse employment action . . . negates any inference that a causal connection exists between the two." *Id.* Even if Walker was aware of Plaintiff's protected

---

the proffered comparators and, unlike the plaintiff, the proffered comparators were working on a fully billable basis).

17

activity in late 2016 or early 2017, the MDR was not issued until May 30, 2018, approximately a

year and a half later. Thus, the Court regards such a "lengthy time lapse" as tending to negate the

inference of a causal connection between Plaintiff's protected activity and the MDR. *Id.*; *see also*

*Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (noting that for "mere temporal

proximity" to be "sufficient evidence of causality" the protected activity and adverse action must

be "very close" (quoting *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001)));

*Roberts*, 998 F.3d at 123 (finding that a three-month gap did not support a finding of causation);

*Causey v. Balog*, 162 F.3d 795, 803 (4th Cir. 1998) (finding that a thirteen-month gap was "too

long to establish causation absent other evidence of retaliation").

### B.      Defendant Had Legitimate, Non-Retaliatory Reasons for Issuing the MDR

Finally, even if the Court concluded that Plaintiff had established a *prima facie* case of

retaliation, Defendant had legitimate, non-retaliatory reasons for the MDR:  (1) the results of the

AR 15-6, and (2) Plaintiff's performance in his detail position.  Indeed, the record contains ample

support for Defendant's two reasons for issuing the MDR.

In the AR 15-6 Final Report, COL Edmonds concluded that, based on the investigation,

Plaintiff "was ill-equipped and unqualified for the technical and leadership demands required of

his position" as Acting Director of Audit Readiness, and had caused the workplace environment

of Audit Readiness to be "hostile, intimidating and in some cases retaliatory . . . for select staff

and contractors." DEX 19 at 2.  Based on the findings in the AR 15-6 Final Report, COL Malone

and Daniels, as Plaintiff's first- and second-line supervisors in Audit Readiness, had every reason

to remove Plaintiff from Audit Readiness. *See Kiel*, 169 F.3d at 1136 (noting that "anti-

discrimination statutes do not insulate an employee from discipline for violating the employer's

rules or disrupting the workplace"); *Ziskie v. Mineta*, 547 F.3d 220, 229 (4th Cir. 2008) ("[A]

complaining worker is not thereby insulated from the consequences of insubordination or poor

18

performance.").

Moreover, Plaintiff had performed well and received very positive ratings during his detail. In her September 2017 assessment, Walker rated Plaintiff positively and described his work in glowing terms, for example: stating that Plaintiff "has been able to do what no one before him has been able to do: get a 4-star signature on the transition plan! This was a huge accomplishment and directly attributable to" Plaintiff; stating that Plaintiff "continues to provide expert advice and counsel in order to ensure the success of [a particular] Army initiative"; noting that Plaintiff was "a key contributor to working through a tight timeline"; stating that Plaintiff "saved the day by leading the efforts on" an assessment; and describing Plaintiff's work in several different areas as "outstanding." DEX 40. In her April 2018 assessment—one month before the MDR—Walker again rated Plaintiff positively and described his work in positive terms, for example: describing Plaintiff as a "key contributor" to the oversight of an assessment; noting that Plaintiff "provided excellent communication and teamwork" on a contracting initiative; and describing Plaintiff's "expertise" and work on a product as "outstanding." DEX 48. Thus, based on Plaintiff's performance during his detail and given her experience as Plaintiff's first-line supervisor in Human Capital, Walker was motivated to agree to Plaintiff's permanent reassignment to the position.

Plaintiff pointed to alleged inconsistencies regarding (1) who decided to issue the MDR and (2) the justification for the MDR as "evidence" that Defendant's two proffered reasons were pretextual, rather than legitimate. The Court, however, finds these "inconsistencies" reasonably reconcilable. Both Daniels and Walker testified that the MDR was their idea and that they considered it the appropriate course of action. Daniels testified that, based on the AR 15-6 Final Report, Plaintiff's "satisfactor[y]" performance in Human Capital, and [the Human Capital employee's] performance in Audit Readiness, an MDR was appropriate to make Plaintiff's detail

permanent.[13] DEX 2 at 36–37. Walker similarly testified that, given the vacancy in Human Capital and Plaintiff's "outstanding" performance during his detail, an MDR was appropriate.  DEX 6 at 34.

The testimony above is not irreconcilable, is consistent with the record, and in fact, reasonably supports *both* that:  (1) per the findings of the AR 15-6, Plaintiff was best removed from Audit Readiness, and (2) due to Plaintiff's performance during his detail, reassignment to Human Capital was a sound choice. And as the Fourth Circuit has stated, "[o]nce an employer has provided a non-discriminatory explanation for its decision, the plaintiff cannot seek to expose that rationale as pretextual by focusing on minor discrepancies that do not cast doubt on the explanation's validity, or by raising points that are wholly irrelevant to it." *Hux v. City of Newport News*, 451 F.3d 311, 315 (4th Cir. 2006).  The Fourth Circuit continued, "[t]he former would not create a 'genuine' dispute, the latter would fail to be 'material[.]'" *Id.* (first citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986), then citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Plaintiff offered no other evidence that Defendant's proffered reasons for the MDR were pretextual, and the Court finds that Plaintiff has not met his burden of presenting evidence from which a jury could reasonably conclude that these reasons were pretextual.

### III.   CONCLUSION

Accordingly, for the foregoing reasons, as well as those stated from the bench, Defendant

---

[13] Lead LMER Specialist Letitia Fournillier also testified that she communicated with both Daniels and Walker about the MDR and indicated that "they wanted to do the MDR based off of the [AR] 15-6 investigation."  Dkt. 69-6 at 12.

is entitled to summary judgment on Plaintiff's retaliation claim.

July 25, 2023
Alexandria, Virginia

Patricia Tolliver Giles
United States District Judge